# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

FILED
MAR 20 2008
March 20, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

MISAEL PADILLA-GALVEZ

CRIMINAL COMPLAINT

CASE NUMBER: MAGISTRATE JUDGE MASON

**08CR 235**

I, Wilfred Taylor, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Starting no later than in or about February 2008, and continuing until in or about March 2008, in Cook County, in the Northern District of Illinois, the defendant herein:

> conspired, and agreed with each other and with others, known and unknown, knowingly and intentionally to distribute and possess with intent to distribute controlled substances, namely, more than one kilogram of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title 21, United States Code, Section 846.

I further state that I am a Special Agent of the Drug Enforcement Administration ("DEA") and that this complaint is based upon the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  __X__ Yes  _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 20, 2008                              at Chicago, Illinois
Date                                        City and State

MICHAEL T. MASON                            _____
United States Magistrate Judge              Signature of Judicial Officer
Name & Title of Judicial Officer

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF COOK | ) |

## AFFIDAVIT OF WILFRED N. TAYLOR

I, Wilfred N. Taylor, having been duly sworn according to law, depose and state as follows:

## I. PRELIMINARY MATTERS

1. I am currently employed as a Special Agent with the United States Department of Justice Drug Enforcement Administration ("DEA"), and have been so employed since March 2003. My official duties and responsibilities include the investigation of narcotics trafficking offenses, in violation of Title 21, of the United States Code, and I have received specialized training in this regard. Prior to joining the DEA, I was an investigator for the City of Chicago Inspector General's Office for approximately two years.

2. I am currently assigned to the Chicago Field Division of the DEA. I am responsible for investigating crimes that involve the unlawful importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952(a), 960 and 963, and Title 18, United States Code, Sections 1956 and 1957. In conducting these investigations, I have used a variety of investigative techniques and resources in several investigations which have included physical and electronic surveillance, monitoring court-authorized wiretaps, managing the use of cooperating witnesses ("CW's") and confidential sources of information ("CS") , and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other Special Agents as well as other law enforcement

personnel, I have become familiar with the methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. I am familiar with the methods employed by narcotics dealers to conduct their drug-related business, including, but not limited to, their use of both prepaid cellular and cellular phones, as well as normal land line phones, public phones, debit calling cards, counter-surveillance, elaborate smuggling schemes tied to legitimate businesses, the use of false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation.

4. I have participated in this investigation since March 2007. The information in this affidavit was gained by me as a result of my personal participation in this investigation; through interviews with and analysis of reports submitted by other Special Agents of the DEA; information furnished by a confidential source; my review of consensually recorded conversations; and surveillance conducted. This affidavit does not contain all of the information I know regarding the persons and events described herein, and it contains a summary of relevant facts.

5. This affidavit is submitted in support of a criminal complaint charging Individual A and MISAEL PADILLA-GALVEZ (PADILLA) with conspiring to possess with intent to distribute more than 1000 grams of heroin, in violation of Title 21, United States Code, Section 846.

## II. PROBABLE CAUSE IN SUPPORT OF THE CRIMINAL COMPLAINT AGAINST INDIVIDUAL A AND MISAEL PADILLA

6. In March of 2007, an individual was arrested for conspiracy to distribute ecstasy. Following his arrest, the individual decided to cooperate with the DEA and became a cooperating

source of information (CS). Since the first interview with the CS in March of 2007, the CS has been charged in federal district court with conspiracy to distribute and to possess with intent to distribute a controlled substance, namely approximately 2,500 tablets containing 3,4-Methylenedioxymethamphetamine (MDMA)(ECSTASY), a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841 (a)(1); in violation of Title 21, United States Code, Section 846. This case is pending.

7. After being charged in the federal criminal complaint, the CS agreed to continue cooperating with law enforcement in its ongoing investigation. In subsequent debriefings, the CS stated that he knew Individual A, who is a drug distributor. The CS also stated that he could initially purchase cocaine from Individual A.

8. Much of the information given to officers by the CS has been independently corroborated and I believe the CS to be credible. In the past, the CS has provided information that has led to several arrests on drug related charges.

9. During the week of February 4, 2008, Individual A contacted the CS telephonically. The CS was not able to record this call. Individual A informed the CS that Individual A had access to heroin for $65,000.00 per kilogram. The CS told Individual A that the CS wanted a sample of the heroin to show to the CS' fictitious customers. The CS immediately contacted your affiant regarding the call. On February 8, 2008, Individual A again contacted the CS telephonically. The CS was not able to record this call. Individual A told the CS that Individual A had obtained a two gram sample of the heroin and that Individual A wanted to meet with the CS to give the free sample of the heroin to the CS. The CS immediately contacted your affiant regarding the call.

10. On February 11, 2008, at DEA direction, the CS met with Individual A near the intersection of Van Buren Street and Wells Street in Chicago, Illinois. During the meeting, the CS was outfitted with a digital recording device and the meeting between Individual A and the CS was recorded. DEA agents were also conducting surveillance of the meeting. According to the CS, Individual A gave the CS a small plastic bag containing approximately two grams of an off-white powder. The conversation between Individual A and the CS was recorded. The CS and Individual A negotiated for the future one kilogram heroin transaction. Individual A told the CS that the price was "65", which the CS understood to mean $65,000.00. When the CS asked if there would be a price break for multiple kilograms, Individual A answered, "I don't know, he told me the price was non-negotiable." Following the meeting, DEA agents obtained the small bag containing the suspect heroin from the CS and conducted a field test of the powder. The test proved positive for the presence of heroin.

11. On March 12, 2008, the CS placed a recorded telephone call to Individual A. Based on the recorded cal, the CS told Individual A that the CS wanted to purchase 1200 grams of heroin. On March 17, 2008, at approximately 2:30 p.m., the CS placed a recorded telephone call to Individual A. Based on the recorded telephone call, Individual A agreed to deliver the heroin to the CS in Evanston, Illinois the following day. Individual A also informed the CS that Individual A's source-of-supply would be present for the transaction.

12. On March 18, 2008, the CS placed a recorded telephone call to Individual A . Based on the recorded telephone call, the CS confirmed that Individual A would meet the CS in Evanston, Illinois. Later that day, based on a recorded telephone call, Individual A told the CS that the heroin was at an apartment in Cicero, Illinois, but the owner of the apartment who had

the keys would not be back until later that evening. During a recorded call, Individual A told the CS that "It's guaranteed tomorrow, it's in our possession, we got it." The two agreed to conduct the transaction the following day (March 19, 2008) around 4:00 p.m.

13. On March 19, 2008, at approximately 2:50 p.m., the CS placed a recorded telephone call to Individual A. Based on the recorded telephone call, Individual A informed the CS that Individual A was going to be "heading that way." The CS told Individual A that the CS was going to meet with Individual A to "check it out" and bring a "little chip off the thing." According to the CS, the CS was referring to inspecting the kilogram of heroin and taking a sample of it to his customers to make sure that they wanted to purchase the whole kilogram. The CS told Individual A that if everything was okay, the CS would return with the "cheddar" (the agreed upon $65,000.00 for the kilogram). The CS later gave Individual A directions to a CVS Pharmacy parking lot located at 3333 Central, Evanston, Illinois.

14. At approximately 4:35 p.m., Individual A called the CS and told the CS that Individual A was at the CVS. This call was not recorded. Around that time, officers observed Individual A arrive in a black Intrepid and park in the CVS parking lot. A few minutes later the CS arrived at the parking lot and got in the black Intrepid with Individual A. The CS was outfitted with a digital recording device and a transmitting device. The recordings of the meeting have not been reviewed at this time. According to the CS, the CS obtained a sample of suspect heroin from Individual A. Also according to the CS, the CS was informed by Individual A that the whole kilogram of heroin was with another individual in a different car that was in the area. The CS exited Individual A's vehicle and departed the area in the CS' vehicle. Officers met with the CS and obtained the sample of suspect heroin. Other officers observed Individual A drive

around the area and circle the parking lot.

15. At approximately 4:50 p.m., the CS called Individual A and told Individual A that the sample looked good. The telephone call was recorded. The CS added that the CS wanted "to make sure you have the whole thing" (referring to the whole kilogram of heroin.) The CS continued that the CS would inspect the whole kilogram because the CS' fictitious customers wanted to "make sure they are not getting a duct tape drywall." The CS asked Individual A to have Individual A's associate meet with the CS and Individual A back at the CVS parking lot so the CS could inspect the package. The CS asked that the kilogram be cut open so that the CS could see inside it and make sure it was the same as the sample. Individual A agreed.

16. At approximately 5:00 p.m., Individual A called the CS and told the CS to "start heading this way" (towards the CVS parking lot). The telephone call was recorded. Individual A asked if the CS would "bring that with you." According to the CS, Individual A was referring to the money for the kilogram. The CS told Individual A that the money was two blocks away and once the CS inspected the kilogram, the CS would bring the money to Individual A. Individual A told the CS, "I got some people with it… it's already here." Individual A later said, "It's going to be sitting in the other car." Individual A told the CS that the CS would have to get in the other car with the other individual to inspect the kilogram. Around the same time as the telephone call, officers observed Individual A arrive back at the CVS parking lot.

17. Shortly after 5:00 p.m., the CS drove to the CVS parking lot. The CS was outfitted with a recording and transmitting device. At this time, the recording of the meeting has not been reviewed. According to the CS, when the CS arrived, Individual A pointed toward another vehicle in the lot. Individual A told the CS that they would go around the block where it

was not so busy. The CS entered Individual A's vehicle and they drove to a street one block east of the CVS. Another individual, later identified as Misael PADILLA-Galvez, followed them in a gray Mercury Sable. The CS got out of Individual A's vehicle and got in PADILLA's vehicle, which parked behind Individual A's vehicle. According to the CS, while the CS was in the passenger seat of PADILLA's vehicle, PADILLA operated a hidden compartment in the floorboard of the vehicle. PADILLA obtained a kilogram sized package that was wrapped in gray duct tape. PADILLA handed the package to the CS. There was a slit in the tape and the CS asked if it was good quality, which PADILLA answered yes. The CS then got out of PADILLA's vehicle and walked toward Individual A's vehicle.

18.   At that time, approximately 5:15 p.m., officers arrived on scene to place PADILLA and Individual A in custody. Officers identified themselves and Individual A fled in his vehicle at a high rate of speed and eluded officers. PADILLA ran from officers a short distance and was subsequently placed in custody after resisting arrest. A gray duct tape package was recovered from the floorboard of PADILLA's vehicle near a hidden compartment on the floorboard of the vehicle. The off-white substance in the package field tested positive for the presence of heroin. The weight of the package was approximately 1145 grams.

19.   PADILLA was transported to the Evanston Police Department. At approximately 6:30 p.m., PADILLA was read his Miranda warning in Spanish. PADILLA agreed to make post-arrest statements. PADILLA informed officers that PADILLA got the car he was driving in Cicero, Illinois from an unknown individual. PADILLA met with "the guy in the black car" (Individual A) in Chicago and followed Individual A to Evanston to talk to another guy (the CS). PADILLA said he only knew Individual A by "Chevy van." During multiple negotiations on

previous days between Individual A and the CS, Individual A arrived in a maroon Chevy van. PADILLA showed officer's a phone contact in his cellular telephone with Individual A's telephone number listed under "Chevy van". PADILLA was asked why he fled from police, which PADILLA didn't give an answer. PADILLA was asked why he resisted arrest. PADILLA answered that he did not resist arrest from police. PADILLA was asked where the drugs in his vehicle came from, which PADILLA stated he did not know where "it" could have come from. Officers clarified by asking PADILLA, "the heroin?" PADILLA answered yes.

## Conclusion

WHEREFORE, Affiant submits that the foregoing evidence establishes that defendants Individual A and MISAEL-PADILLA GALVEZ violated Title 21, United States Code, Section 841 (a)(1), all in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

Wilfred Taylor, Special Agent
Drug Enforcement Administration
United States Department of Justice

SUBSCRIBED AND SWORN TO BEFORE ME
this 20th Day of March, 2008

MICHAEL T. MASON
United States Magistrate Judge